UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DELBERT DWAYNE TINSLEY, | CV F 03 5907 REC SMS HC |
| Petitioner, | |
| v. | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| R. L. RUNNELS, | |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**PROCEDURAL HISTORY**[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Stanislaus, entered on April 14, 2000, following his conviction by jury trial of murder in the second degree in violation of Cal. Penal Code § 187. See Exhibit 1, Answer to Petition for Writ of Habeas Corpus (hereinafter "Answer"). The jury found true the allegations that Petitioner had personally used a knife and a fireplace poker in the commission of the murder within the meaning of Cal. Penal Code § 12022(b). Id. Petitioner was

---

[1] This information is derived from the petition for writ of habeas corpus and Respondent's answer to the petition.

sentenced to an indeterminate term of 17 years to life with the possibility of parole. Id.

Thereafter, Petitioner filed a notice of appeal with the California Court of Appeal, Fifth Appellate District (hereinafter "5th DCA"). On April 30, 2002, the 5th DCA issued an unpublished opinion affirming the judgment. See Exhibit 3, Answer.

On June 4, 2002, Petitioner filed a petition for review with the California Supreme Court. See Exhibit 4, Answer. On July 10, 2002, the California Supreme Court denied the petition. See Exhibit 5, Answer.

On July 2, 2003, Petitioner filed the instant federal habeas petition in this Court. Petitioner raises one ground for relief: He claims there was insufficient evidence to show that his actions were the proximate cause of the victim's death.

On September 3, 2003, Respondent filed an answer to the petition.

Petitioner did not file a traverse.

**FACTUAL BACKGROUND**

On June 1, 1998, at approximately 8:00 a.m. to 9:00 a.m., Jose Barrera was riding his bicycle along the banks of an irrigation canal near the city of Escalon in the county of Stanislaus when he discovered the body of a woman lying on her back on the canal bank approximately two to two and a half meters from the water's edge. (RT[2] 480-481, 494-498.) Mr. Barrera saw plastic near the woman. (RT 485.) As Mr. Barrera made his way down the canal bank toward the woman, she attempted to sit up twice but lay back down. (RT 481.) She then pushed using her hands by her side and slid on her back little by little into the water. (RT 481-484, 487.) Mr. Barrera heard the victim moaning. (RT 485.) Once in the water, she made a few dog paddle swimming-type motions with her hands but the current carried her away downstream. (RT 482, 489.) Mr. Barrera then left to call 911. (RT 488.) When the firemen arrived, they retrieved the body of Cindy Hubbard from the irrigation canal. (RT 489, 494, 500.) An autopsy of Hubbard's body revealed she had been severely beaten and stabbed numerous times. (RT 135-140.)

---

[2]"RT" refers to the Reporter's Transcript lodged with the Court.

1        On the previous night, Petitioner, James Dominguez, and Tina Dominguez[3] returned to James
2   Dominguez's home in Modesto following a trip to the Bay Area. (RT 65-66.) They arrived in
3   Modesto at approximately 10:00 p.m. to 11:00 p.m. (RT 67, 314.) After running a couple of errands,
4   Petitioner, James Dominguez, Tina Dominguez, and Tina's daughter Aliza arrived at the Dominguez
5   home. (RT 67, 315.)  Petitioner and James left soon thereafter. (RT 315.)

6        At around 12:00 a.m., Petitioner and James arrived at Aaron Murillo's house. (RT 219, 315-
7   316, 318, 690.) Petitioner had driven them over in his car. (RT 219-220, 691.) After "hanging
8   around" for a time, Petitioner, James, John Lopez and Victor Quiroz left the Murillo residence in
9   Petitioner's Cadillac and headed to a store. (RT 221-222, 319, 694.) However, the store was closed.
10  (RT 222, 320.) Petitioner then broke into the store and Victor helped him steal a case and a half of
11  beer. (RT 222-223, 320-321, 695-696.) The four of them then left the store in Petitioner's car and
12  went to James' house. (RT 224, 321, 697.) Petitioner parked the car in the driveway facing the
13  garage. (RT 230, 328.)

14       Around 1:00 a.m. or 2:00 a.m., Tina was awakened when Petitioner, James Dominguez,
15  Victor Quiroz, and John Lopez entered the house. (RT 68, 225.) Tina spoke to James and then went
16  back to bed with her daughter. (RT 69, 225, 322, 697.) Petitioner, James, Victor and John initially
17  sat in the living room, talked, and drank beer, but at around 6:00 a.m., they went out onto the porch
18  in front of the house and continued to talk and drink beer. (RT 226, 322-323, 698.) At one point,
19  Petitioner jokingly made a comment to James that he wanted to "take his frustrations out." (RT 339.)
20  While they were sitting in the front of the house, a man on rollerblades skated past. (RT 698.)
21  Petitioner ran toward him, confronted him, and called him a "queer". (RT 699.) The man
22  immediately left "like he was scared." (RT 699.) Petitioner returned to the porch and said, "It's just a
23  queer, a queer on skates." (RT 699-700.)

24       Later, a woman walked by. (RT 324, 702.) Petitioner talked to the woman, but she continued
25  to walk away from the house. (RT 324.) She later returned and came into the garage. (RT 705.)
26  James and John then went back inside the house. (RT 227, 707.) John was hungry and started

---

28     [3]Tina Dominguez and James Dominguez were engaged at the time. (RT 66.)

1  cooking some sausage. (RT 227, 326.) James recalled that Petitioner came into the house and asked
2  if the woman could "hang out" with them in the garage. (RT 325.) James told Petitioner that he
3  didn't mind. (RT 325.) Victor stated that he watched Petitioner and the woman get into an argument
4  involving drugs. (RT 705.) Victor testified that Petitioner told the woman, "You're just looking for
5  drugs, you're just a dopehead," or something along those lines. (RT 706.) Petitioner also called the
6  woman "white trash." (RT 707.) Petitioner then attacked the woman, choking her and slapping her.
7  (RT 708.) The woman attempted to block him. (RT 708.) Petitioner continued to attack her, and
8  Victor attempted to separate them; however, Petitioner did not desist and stated, "I have to do it."
9  (RT 709.) Victor told Petitioner, "Just let her go, just let her go, there's no reason to be doing this."
10 (RT 710.) Petitioner just continued, stating, "I can't let her go. She knows, she knows something."
11 (RT 710.) Victor asked Petitioner, "What are you going to do?" (RT 712.) Petitioner stated that he
12 "was just going to scare her." (RT 712.) Victor then backed away and went into the house to use the
13 bathroom and get more beer. (RT 712.)

14   Later, Petitioner entered the house and asked James if he could close the large garage door.
15 (RT 327.) James responded by saying he could. (RT 328.) James and John then heard the large
16 garage door close. (RT 231, 330.) James opened the door into the garage and John saw Petitioner
17 holding a woman in his arms attempting to kiss her. (RT 233.) James closed the door, went into the
18 living room and turned on the radio. (RT 234-235.) He appeared scared. (RT 235.) John continued
19 cooking the sausage. (RT 235.) James told John not to go into the garage, and John responded by
20 asking, "What the hell is going on?" (RT 235.) James did not respond. (RT 236.) John lost his
21 appetite, stopped cooking and went into the front room. (RT 236.) He "knew something was going
22 on." (RT 238.) He heard a woman's voice coming from the garage saying, "Leave me alone." (RT
23 239.) He then heard a voice from who he thought was Petitioner say, "Shut up." (RT 239.) He heard
24 a voice again say, "Be quiet, shut up." (RT 243.) Victor had gone back into the garage. (RT 713.) He
25 recalled that Petitioner told him, "I think I killed her." (RT 714.) James recalled hearing voices
26 coming from the garage, but he did not remember who was speaking. (RT 330.) Victor saw the
27 woman lying on the ground with blood around her head. (RT 714.) Victor walked up to the woman
28 and attempted to nudge her thinking that she was dead. (RT 715.) The woman moved and grabbed

for him, but Victor kicked the woman away. (RT 715.) Petitioner came in behind him and said, "Man, she's still alive." (RT 716.) Petitioner then started stomping on her and kicking her. (RT 717.) Victor recalled Petitioner stating, "She won't go down, she won't go down. She won't die, she keeps on getting up." (RT 718.) Victor came into the house looking scared and like he wanted to cry. (RT 239-240.) As Victor walked into the front room where James and John were, he looked down and shook his head from side to side. (RT 242.) Petitioner came in about two or three minutes after Victor. (RT 240, 330.) Petitioner went to the bathroom and started throwing up. (RT 243.) When he had finished, he walked back into the kitchen, picked up a pocket knife from the kitchen, and went into the garage. (RT 244, 343.) Victor also went back into the garage. (RT 245.) Victor recalled that Petitioner handed him a knife. (RT 719.) Victor opened the knife, then closed it back up and handed it to Petitioner. (RT 719.) Petitioner then opened the knife, walked over to the woman, and started stabbing her. (RT 719.)

     Tina recalled waking up and hearing someone throwing up in the bathroom. (RT 71.) She went into the kitchen and saw James sitting on a chair in the living room and John lying on the couch. (RT 72.) She then returned to bed.

     John testified that Petitioner again entered the house from the garage carrying the pocket knife. (RT 245, 359.)  Petitioner stated, "I killed her." (RT 245, 333.) He stated that he had hit the victim on the head with a rod. (RT 246, 261.) John noticed that Petitioner's pants appeared dark and wet. (RT 260.) Petitioner left the knife on the kitchen table, and James later hid the knife in the kitchen oven. (RT 359-360.) Petitioner then asked James for some plastic and a blanket, and James went into a room and ripped plastic from a mattress. (RT 246.) James gave the plastic, a blanket, and a mop to Petitioner and Petitioner returned to the garage. (RT 247, 344, 356.) John then lay down on the couch and tried to go to sleep. (RT 247.) James then went into the garage and saw Victor and Petitioner standing with the victim lying on the ground. (RT 338, 341.) James saw blood on the trunk of the vehicle that was in the garage. (RT 358.) James gave Petitioner and Victor some plastic bags in which to put the towels that they had used to clean up the blood. (RT 343.) Victor helped Petitioner place the victim into the trunk of Petitioner's Cadillac. (RT 724.) John later heard a car start up and the main garage door lift open. (RT 248.) Petitioner reentered the house and told James,

1  "I'm going to drop her ass off." (RT 249.) After the car left, John heard water running near the front
2  of the house. (RT 250.) John got up and saw that Petitioner's Cadillac was gone. (RT 250.)

3        Victor left with Petitioner in his Cadillac expecting that Petitioner would drop him off at his
4  home. (RT 724-725.) However, Petitioner drove "out towards the country, Escalon area." (RT 726.)
5  Petitioner drove to a canal and parked his car. (RT 726.) Victor and Petitioner then unloaded the
6  victim from the car and placed her on the canal bank. (RT 726.) They then got back into the car and
7  returned to James Dominguez' house. (RT 363, 728.)

8        At approximately 9:00 a.m., Michelle Pritchard was driving home after having dropped her
9  children off at school. (RT 513.) As she was driving down Harrold Road, she spotted a vehicle that a
10 had backed up to the edge of the canal bank. (RT 510-511.) She saw two men near the car. (RT 514.)
11 Later that day, Ms. Pritchard was driving the same route when she saw emergency personnel at the
12 same area she had seen the vehicle and the two men. (RT 515.)

13       When Petitioner entered the house, he told James "not to worry about it, he took care of it."
14 (RT 363.) Victor and Petitioner then attempted to clean up the garage with water and towels. (RT
15 728, 729.) A short time thereafter, James entered the bedroom and had a conversation with Tina in
16 which James told Tina what had occurred. (RT 75, 358.) Approximately five minutes later,
17 Petitioner entered the bedroom asking James for clothes to wear. (RT 75, 365.) After Petitioner
18 obtained clothes from Petitioner, there was knocking on the door and the doorbell rang. (RT 77,
19 366.) When no one answered the door, Tina got up and went into the living room. (RT 77.) John was
20 sleeping on one couch and Petitioner was lying on another. (RT 77.) Petitioner told Tina to return to
21 her bedroom. (RT 77-78.) When she turned around to do so, a police officer told her to put her hands
22 up. (RT 78.) Victor had seen the police approaching the house, so he ran out the back door, jumped
23 over a fence and ran away. (RT 730.) He was arrested the following day. (RT 732.) John recalled
24 hearing the police at the door demanding that he come out of the house. (RT 251.) John then exited
25 the house with his hands above his head and was placed into custody. (RT 253.) James also exited
26 the house at gunpoint and was placed into custody. (RT 367.) Petitioner was also placed in custody.
27 (RT 558.) Officer Kelly Harris personally placed him into her police vehicle; she testified that he did
28 not appear to be under the influence of alcohol. (RT 558.) As John was being led away, he noticed

1   that the Cadillac was back on the driveway. (RT 261.)

2          According to John, during the morning hours of the date of the incident he was not drunk,
3   and James did not appear to be drunk. (RT 228.) Victor, however, appeared to be drunk, and
4   Petitioner appeared to be slightly drunk. (RT 229, 231.) Victor testified that he was somewhat drunk
5   from beer, but he was feeling the effects of methamphetamines which he had taken earlier. (RT 704,
6   705.)

7          At the police station, James gave the police permission to search his house and the Pontiac
8   located in the garage. (RT 368-370.) Tina also gave permission to search the house. (RT 567.)
9   Petitioner gave permission to search his Cadillac. (RT 570.) In the garage, police investigators found
10  blood on the inside of the garage door, on the garage floor, on the Pontiac located in the garage, on
11  the trunk of the Cadillac located in the driveway, inside the trunk of the Cadillac, on the rear bumper
12  of the Cadillac, and on the undercarriage of the Cadillac; they also found a mop and bucket that had
13  recently been used, and wet clothing. (RT 535, 553, 565-566.)

14         When Tina was first questioned by police, she told them she was asleep during the entire
15  incident and that no one was at the home except for she and James. (RT 83.) After further
16  questioning, however, she told her whole story. (RT 84.) John also did not tell the entire story to the
17  police when he was first questioned, because he stated he was scared that Petitioner and Victor
18  would harm him. (RT 264.) After he was repeatedly questioned, though, John provided all of the
19  details to the police as he remembered them. (RT 267.) James initially did not tell the police the
20  entire truth, because he did not want Petitioner or Victor to get into trouble. (RT 371.) After being
21  questioned by the police, however, James divulged the details of the incident. (RT 371.) James was
22  concerned for the safety of his family. (RT 371.) James also told the investigators of the location of
23  the pocket knife. (RT 374.) After the incident, Tina found car keys which belonged to Petitioner's
24  Cadillac in her cat's litter box. (RT 88-89.) She and James immediately turned the keys over to the
25  police. (RT 89, 375.) Victor was also questioned by the police, and he told investigators the full story
26  of what had occurred. (RT 740-741.)

27         On June 3, 1998, an autopsy was performed on the body of Cindy Hubbard by Dr. Sally
28  Fitterer. (RT 132.) The autopsy revealed that the victim had sustained many external injuries

including contusions, bruises, scrapes, lacerations, cuts due to blunt force, and stab wounds. (RT 133.) The victim sustained several lacerations, contusions, and patterned injuries to the head, a fractured nose, a fracture to the jaw, an evulsion of a tooth, a stab wound to the left shoulder, a stab wound to the left side of the neck and a stab wound to the left cheek. (RT 135-137, 147.) The stab wounds had been caused by a single-edged sharp implement such as a knife. (RT 137-138.) Dr. Fitterer found it significant that there was not a great amount of blood present in the stab wounds, especially since the wound to the neck showed the knife actually pierced the left internal jugular vein. (RT 138.) According to Dr. Fitterer, one possible explanation for the small amount of blood would be that the victim had sustained the facial injuries prior to the stabbing. (RT 138-139.) The facial beating would cause the blood pressure to drop, and the profuse amount of blood which would ordinarily be produced from such facial wounds would lessen the amount of blood volume. (RT 138-139.) The victim also sustained several lacerations, contusions, and patterned injuries to her back and shoulders, as well as some minor scrapes, contusions and abrasions to her arms and legs. (RT 142-146.)

The patterned injuries showed the victim had been beaten with a fireplace poker. (RT 162.) However, there was no evidence that the victim had been kicked with a shoe or boot. (RT 158.) In addition, the patterned injuries and severe lacerations were not consistent with trauma inflicted by the body possibly bumping across the bottom of the irrigation canal. (RT 171.)

The internal autopsy revealed the victim had sustained some brain injuries consistent with blunt force trauma to the victim's head. (RT 150-151.) In addition, Dr. Fitterer found foamy, frothy fluid inside the victim's lungs which was consistent with the discovery of the victim's body in the irrigation canal. (RT 154.) Dr. Fitterer certified the cause of death as asphyxia due to fresh water drowning. (RT 154.) The significant blood loss due to the scalp and face lacerations and the stab wounds contributed to death. (RT 154.) Dr. Fitterer could not determine whether the victim would have survived had she not drowned in the irrigation canal. (RT 155, 165.) Nevertheless, the victim was still alive but unconscious for an unknown period of time after the severe beating as evidenced by the presence of pneumonia in her bronchial tissue. (RT 155-156.) Dr. Fitterer also noted that the victim had a minor amount of methamphetamine present in her blood stream. (RT 164.)

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II.  Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

1  As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state

U.S. District Court
E. D. California         cd              10

court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

### III. Review of Petitioner's Claim

In his sole ground for relief, Petitioner claims the evidence was insufficient to support a finding that Petitioner's actions were the proximate cause of the victim's death. Noting the forensic pathologist testified the cause of death to be asphyxia due to drowning, Petitioner contends the wounds sustained as a result of the beating and stabbing did not cause the victim's death. Petitioner alleges the victim chose to go swimming, and this action was a superceding cause which severed the chain of causation. Respondent contends the evidence was more than sufficient.

In reviewing sufficiency of evidence claims, California courts expressly follow the Jackson standard enunciated in Jackson v. Virginia, 443 U.S. 307 (1979). See People v. Johnson, 26 Cal.3d 557, 575-578 (1980); see also People v. Thomas, 2 Cal.4th 489, 513 (1992). Pursuant to the Supreme Court's holding in Jackson, the test in determining whether a factual finding is fairly supported by the record is as follows:

> "[W]hether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990).

Sufficiency claims are judged by the elements defined by state law. Jackson, 443 U.S. at 324 n. 16. This Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986). This presumption of correctness applies to state appellate determinations of fact as well as those of the state trial courts. Tinsley v. Borg, 895 F.2d 520, 525 (9th Cir.1990). Although the presumption of correctness does not apply to state court determinations of legal questions or mixed questions of law and fact, the facts as found by the state court underlying those determinations are entitled to the presumption. Sumner v. Mata, 455 U.S. 539, 597 (1981).

This claim was first presented on direct appeal to the 5th DCA. On April 30, 2002, the 5th DCA denied the claim in a reasoned opinion. See Exhibit 3, Answer. On June 4, 2002, Petitioner

raised the claim in a petition for review before the California Supreme Court. See Exhibit 4, Answer. The petition was summarily denied on July 10, 2002, without comment or citation of authority. See Exhibit 5, Answer. The California Supreme Court, by its "silent order" denying review of the 5th DCA's decision, is presumed to have denied the claims presented for the same reasons stated in the opinion of the 5th DCA. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In reviewing Petitioner's claim, the 5th DCA first noted that under California law, "in order [for a defendant] to be liable for the death of another, the death must be a natural and probable consequence of the defendant's actions." See p. 10, Exhibit 3, Answer. Furthermore, an independent intervening cause would absolve a defendant of criminal liability if the cause was "unforeseeable . . . an extraordinary and abnormal occurrence, which rises to the level of an exonerating, superceding cause." Id. If on the other hand, the intervening cause is "a normal and reasonably foreseeable result of defendant's original act, the intervening act is 'dependent' and not a supercediing cause, and will not relieve defendant of liability." Id.

The 5th DCA first noted that Petitioner's actions "were a significant factor in the victim's death." See p. 11, Exhibit 3, Answer. The appellate court noted that the forensic pathologist had testified that the wounds inflicted by Petitioner contributed to the victim's death because they accounted for significant blood loss and an extremely low blood pressure. Id. The pathologist opined that the injuries caused the victim to succumb to drowning, because under other circumstances, the victim would not have drowned when she entered the water. Id. Accordingly, the appellate court found that the jury reasonably found appellant's actions were the proximate cause of death. Id.

The 5th DCA next found meritless Petitioner's argument that the victim's action of getting into the water and "going for a swim" was an independent intervening cause. The appellate court determined the jury could reasonably find that "it was foreseeable the victim would slide into the water and drown after [Petitioner] severely beat the victim and left her near the edge of a fast-moving canal." Id. The court noted that the eyewitness testimony demonstrated that the victim either crawled or slid into the water. Id. The court noted that the victim had been severely beaten and had sustained multiple serious injuries including contusions, lacerations, stab wounds, brain hemorrhaging, fractures, and an evulsion. Id. The court found the jury could reasonably infer that the

victim, as a result of her injuries, slipped into the water and drowned. Id. The court concluded the evidence was sufficient to support a finding that Petitioner was the proximate cause of the victim's death. Id.

Likewise, this Court concludes that Petitioner's actions were the proximate cause of the victim's death. As noted above, the evidence demonstrated that Petitioner inflicted a potentially fatal beating and stabbing of the victim using a fireplace poker and a knife. The record shows Petitioner threw the body of the victim onto a canal bank only two to two and a half meters from the water's edge, and left her there. It was certainly foreseeable that the victim's body would slide into the water.

This Court also finds meritless Petitioner's argument that the victim's action of "going for a swim" was an independent superceding cause. According to eyewitness Barrera, the victim was lying on her back on the canal bank. (RT 480-481, 494-498.) As he attempted to approach, Mr. Barrera watched the victim attempt to sit up twice but lie back down. (RT 481.) He testified that she then pushed using her hands by her side and slid on her back little by little into the water. (RT 481-484, 487.) He testified that he heard the victim moaning. (RT 485.) Finally, he stated that once in the water, the victim made a few dog paddle swimming-type motions with her hands before the current ultimately carried her away. (RT 482, 489.) In light of this evidence, it was certainly reasonable for the jury to conclude that the victim slid into the water. Or, the jury could reasonably have concluded that the victim, hearing the approaching person and fearful of further beating or stabbing, pushed herself into the water. The jury could also have concluded that the victim, delirious because of her wounds, pushed herself into the water. In either scenario, the victim's actions were a normal and reasonably foreseeable result of defendant's original acts and were not independent acts which would rise to the level of an exonerating, superceding cause.

Accordingly, the state court rejection of this claim was not contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor did the state court resolution result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented. See 28 U.S.C. § 2254(d). The claim must be denied.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Robert E. Coyle, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    May 12, 2005**                    **/s/ Sandra M. Snyder**
icido3                                        UNITED STATES MAGISTRATE JUDGE